# DEFENDANT TRANS UNION LLC'S CONCISE STATEMENT OF MATERIAL FACTS AND EVIDENCE

# EXHIBIT "B"

Page 1

1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF HAWAII

2
  Case No. CV 04-00174 DAE-KSC

3
  GERALD H. ELLER,                        **COPY**

4
  Plaintiff,

5
  vs.

6
  EXPERIAN INFORMATION SOLUTIONS, INC., a foreign

7 corporation; TRANS UNION, LLC, a foreign corporation;
  and BANK ONE CORPORATION, a foreign corporation,

8
  Defendants.

9
  --------------------------------------------------------

10     VIDEOTAPED DEPOSITION OF GERALD H. ELLER
                     VOLUME 2

11              November 21, 2005

12 --------------------------------------------------------

13                              Deposition Location:
                                6851 Tower Road

14                              Denver, Colorado 80249

15 APPEARANCES:

                   ROBERT S. SOLA, ESQ.

16                 8835 S.W. Canyon Lane
                   Suite 130

17                 Portland, Oregon  97225
                              For Plaintiff

18
19
  ALSO PRESENT:  Reed Hall, Videographer

20
21
22                      CONFIDENTIAL
23 **DISK ENCLOSED**
24

# AVERY WOODS REPORTING



455 Sherman Street, Suite 250 • Denver, Colorado 80203
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305
www.averywoods.net

12

1          MR. BEHRENDT:  That's fine.  Okay.

2          Q.   (BY MR. BEHRENDT) All right.  All

3     right.  Looking at page 141, Mr. Eller, at the

4     bottom, the information included there, was that

5     provided by you?

6          A.   Verbally, yes.

7          Q.   Okay.  Do you remember when you gave

8     that information verbally?

9          A.   I believe it was in September of 2001.

10         Q.   And do you know -- or who did you give

11    that information to?

12         A.   To Staff Sergeant John Kellogg.

13         Q.   And what was the purpose of providing

14    that information?

15         A.   Because I was applying to enter the

16    United States Army.

17         Q.   Okay.  And going to -- starting, for

18    example, on page 141, looks like you provided your

19    personal information, other names you've used, people

20    who know you, et cetera; is that accurate?

21         A.   Correct.

22         Q.   Okay.  And then on page 142, you

23    provide your employment activities as well; is that

24    correct?

25         A.   Yes.

1        Q.   Okay.  I wanted to jump to page 145,

2   question 20.  Question 20 asks have you ever -- have

3   any of the following happened to you in the last ten

4   years.  And the first item is fired from job.  Your

5   answer to that question was no; is that correct?

6        A.   Yes.

7        Q.   Okay.  At the time, though, that you

8   gave that information you had, in fact, been fired

9   from the Moore Corporation?

10       A.   Yes.

11       Q.   And MCI?

12       A.   Yes.

13       Q.   Okay.  And so that response was not

14  accurate, correct?

15       A.   That response was made upon the advice

16  and consent of my recruiter, John Kellog, Staff

17  Sergeant.

18            MR. BRADLEY:  Object; move to strike as

19  nonresponse.

20       Q.   (BY MR. BEHRENDT) That information was

21  not accurate, correct?

22       A.   Again, the response was given upon the

23  advice and consent of Staff Sergeant John Kellogg.

24            MR. BRADLEY:  Object; move to strike as

25  nonresponsive.

1          Q.    (BY MR. BEHRENDT) My question is isn't

2    it true that that information you provided was

3    incorrect?  Not why you provided it or on whose

4    advice; but yes or no, isn't it true that information

5    is not correct?

6          A.    I can't answer that question.  It was

7    answered upon the advice and consent of Staff

8    Sergeant John Kellogg.

9              MR. BEHRENDT:  I'll move to strike as

10   nonresponsive.

11         Q.    (BY MR. BEHRENDT) Mr. Eller, the

12   question is isn't it true that the information you

13   provided in response to that question was not

14   correct?

15             MR. SOLA:  I object, asked and

16   answered.

17             MR. BEHRENDT:  Asked but not answered.

18         Q.    (BY MR. BEHRENDT) Would you please do

19   so at this time, yes or no?

20         A.    Could you ask the question again,

21   please.

22         Q.    Sure.  Isn't it true that the

23   information provided in response to question 20 was

24   not correct; yes or no?

25             MR. SOLA:  Object, asked and answered.

1      A.   Again, it was answered upon the advice

2  and consent of the person who provided me this

3  application and who produced this application, Staff

4  Sergeant John Kellogg.

5      Q.   (BY MR. BEHRENDT) You can't say whether

6  or not that information is correct?

7          MR. SOLA:  Object, asked and answered.

8      A.   Interpretation --

9          MR. BEHRENDT:  It's been asked but not

10  yet answered.

11      A.   It's an interpretation.  I answered the

12  question 20 as no.

13      Q.   (BY MR. BEHRENDT) And that was not

14  correct?

15      A.   It's an interpretation of who -- again,

16  it was answered upon the advice and consent of my

17  recruiter, Staff Sergeant John Kellogg, who provided

18  this application.

19          MR. BEHRENDT:  Okay.  I'm going to move

20  to strike as nonresponsive.

21          MR. BRADLEY:  Join.

22          THE DEPONENT:  I mean, there's multiple

23  questions on this application that are inaccurate and

24  untruthful, not just question 20.

25      Q.   (BY MR. BEHRENDT) Answers that you gave

1    that were inaccurate and untruthful?

2         A.   There's numerous -- you know, I mean,

3    we'd have to go over every question if we want to

4    know the content and the context and the way they

5    were asked and answered.

6         Q.   Okay.

7         A.   And that includes --

8         MR. SOLA:   Wait for a question.

9         A.   -- other questions.

10        MR. SOLA:   Wait for a question.

11        Q.   (BY MR. BEHRENDT) That's fine, Jerry.

12    Go ahead.   That includes what?

13        MR. SOLA:   No.   There's no question.

14    Do you have a question?

15        Q.   (BY MR. BEHRENDT) My question is would

16    you go ahead and continue with what you were saying.

17        MR. SOLA:   Object, vague.

18        Q.   (BY MR. BEHRENDT) Do you understand

19    what I'm asking?

20        A.   Sure.   I'll answer it.

21        Q.   Okay.

22        A.   Questions 33, 32 --

23        Q.   What's -- okay.   What about 32?

24        A.   32 asks about, to my knowledge, about

25    clearances.

1          Q.   Did Sergeant Kellogg tell you it was

2  okay to lie on this application?

3          A.   Not to my knowledge, no.

4          Q.   Did Sergeant Kellogg instruct you to

5  lie on this application?

6          A.   Not to my knowledge, no.

7          Q.   Looking at page 148, the certification

8  directly above your signature reads my statements on

9  this form and any attachments to it are true,

10  complete, and correct to the best of my knowledge and

11  belief and are made in good faith; I understand that

12  a knowing and willful false statement on this form

13  can be punished by fine or imprisonment or both.

14          Were you ever punished by fine or

15  imprisonment for making false statements on this

16  application?

17          A.   No, I was not.

18          Q.   All right.  Turning back to page 147,

19  item 40, asking about being a party to civil or court

20  actions in the last seven years.  Did you remember at

21  the time you completed this interview and signed this

22  document that you had been a party to a lawsuit

23  against Trans Union?  I mean, you hadn't forgotten

24  about that, had you?

25          A.   No, I had not forgotten about that, no.

1          Q.    Do you know whether the Army's ultimate

2    decision in February of 2002 not to give you an air

3    traffic controller job had anything to do with the

4    false statements contained in this application?

5          A.    Could you ask that again, please.

6          MR. BRADLEY:  Could you read it back,

7    please.

8          (Whereupon, the question beginning at

9    page 29, line 1, was read by the reporter.)

10         A.    No I do not.

11         Q.    (BY MR. BRADLEY) You don't know?

12         A.    Don't know, no.

13         Q.    Okay.  Thank you.

14         The handwritten numbers in the lower

15    right-hand corner of the pages of this exhibit, is

16    that your handwriting?

17         A.    I don't believe so, no.

18         Q.    Do you know how that got on there?

19         A.    No, I don't know; I don't believe so,

20    no.

21         MR. BRADLEY:  Okay.  I think that's all

22    the questions I have about this exhibit.  Thank you.

23         EXAMINATION (continued)

24    BY MR. BEHRENDT:

25         Q.    Just quick followup on question 40.

1          A.   Yes, I believe so.

2          Q.   Did you tell anyone in the Army about

3    it?

4          A.   I believe I did, yes.

5          Q.   You include it on any of your

6    applications?

7          A.   I thought I did, yes.

8          Q.   But, in fact, did you?

9          A.   I don't know.

10          Q.   Have you seen any documents that you

11    reviewed indicating that you, in fact, disclosed your

12    contact with this Canadian national to the Army?

13          A.   I believe on February 20, 2002, I

14    answered that I had contacted a Canadian national to

15    Sergeant First Class Deidre Williams in the Denver

16    MEPS station.

17          Q.   And is there a document that indicates

18    that?

19          A.   There may or may not be.  You'd have to

20    get that from the federal government.

21          Q.   Have you seen any documents that

22    indicate that?

23          A.   That day, I believe I notified the

24    federal government.

25          Q.   All right.  Is that information

1    your security clearance for the 74 Charlie position?

2            A.    It could be, yes.

3            Q.    And what's your understanding as to the

4    purpose of the testimonies collected?

5            A.    I do not know.

6            Q.    Is it your understanding that the

7    purpose is for the Army to be allowed to make a

8    decision as to whether or not to grant you security

9    clearance?

10           A.    Could be, yes.

11           Q.    Looking at item 003, name Cheri,

12   C-H-E-R-I; middle initial K; last name Evjen,

13   E-V-J-E-N, do you know who that person is?

14           A.    Yes.

15           Q.    Who is that?

16           A.    It's a former landlord.

17           Q.    Landlord where?

18           A.    At 2626 Manassas Way, Colorado Springs,

19   Colorado, 80922.

20           Q.    Did you ever talk to her about your

21   credit issues?

22           A.    Yes.

23           Q.    And looking at the bottom of the page

24   with the sentence beginning he was stressed, could

25   you read those two sentences, please, for the record.

1   blacked out, unknown person or comment or statement.

2        Q.    (BY MR. BEHRENDT) Is that statement

3   attributed to David Mangum true?

4        A.    What, that I sent him an email?

5        Q.    Yes.

6        A.    He may or may not have received an

7   email.

8        Q.    Did you author such an email?

9        A.    I may or may not have.

10       Q.    And this was in 2001?

11       A.    September of 2001.

12       Q.    And were you emotionally distressed at

13   that time?

14       A.    Yes.  I think all Americans were

15   emotionally distressed at that time.

16       Q.    And that was for a reason other than

17   something Experian was reporting about you?

18       A.    It was because of the events and

19   occurrences of September 11, 2001.

20       Q.    Did you make a comment to the class in

21   Colorado Springs that you were going to bring your 9

22   millimeter firearm to class?

23       A.    No.  I was not in a class or in a class

24   setting.

25       Q.    Did you tell that to anyone at the

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1   time?

2          A.   I may or may have.

3          Q.   Why were you going to bring your 9

4   millimeter firearm to class?

5          A.   To protect myself.

6          Q.   From who?

7          A.   From whoever might threaten me.

8          Q.   Who did you think may threaten you?

9          A.   I don't know.

10         Q.   Why did you think someone may threaten

11  you?

12         A.   Because they had just attacked the

13  World Trade Center and the Pentagon, and I was in a

14  class with numerous, multiple foreign exchange

15  students.  And I was in a high target area, located

16  between the Air Force Academy, NORAD, Schriever Air

17  Force Base, Fort Carson Air Force Base -- or Army

18  Base, Peterson Air Force Base.  And I had just seen a

19  contingency of Bosnia and Herzegovina officers of

20  about 25 to 40 earlier dressed in foreign uniforms

21  touring my campus facility within two months of

22  September 11, 2001.  So I don't know what, or what

23  could occur.

24         Q.   Did you think the foreign exchange

25  students posed a potential threat to you?

1     A.    They could have, yes.

2     Q.    What nationalities were they?

3     A.    Pakistani, Vietnamese, Indian, and

4 other countries that I don't know of.

5     Q.    And did you think the officers from

6 Bosnia Herzegovina presented a potential threat to

7 you?

8     A.    I don't know.  They may have.  They

9 could have.

10    Q.    Did you, in fact, bring your 9

11 millimeter firearm to class?

12    A.    No, I did not.

13    Q.    Did you bring it on to campus?

14    A.    No, I did not.

15    Q.    Did you bring it with you in your car

16 to school?

17    A.    No, I did not.

18    Q.    Is it your understanding that this --

19 these incidents were reported to the Army as part of

20 their background investigation for your 74 Charlie

21 security clearance?

22    A.    It appears that way, without any

23 official defense or notification to defend myself or

24 anything, no official warrant, no official arrests,

25 nothing.

```
 1              Q.    Did you speak to some officers that

 2    day?

 3              A.    I believe so.

 4              Q.    And did you feel that those officers

 5    were being helpful to your cause?

 6              A.    No.

 7              Q.    Why not?

 8              A.    They seemed threatening and aggressive.

 9              Q.    What were they doing?

10              A.    They were questioning me and

11    insinuating that they were going to arrest me for

12    violation of my First Amendment and Second Amendment

13    rights of the United States Constitution.

14              Q.    Going to page 87 where it says copy of

15    email attachment, did you send an email to people in

16    your class?

17              A.    I may or may not have.

18              Q.    Could you read the paragraph below copy

19    of email attachment and tell me if you, in fact, did

20    send such an email.

21              A.    The whole paragraph?

22              Q.    Please.

23              MR. SOLA:  You don't mean out loud,

24    right?

25              MR. BEHRENDT:   I think it would be
```

1    helpful to do it out loud.

2                MR. SOLA:  Why?

3         Q.    (BY MR. BEHRENDT) Go ahead, Mr. Eller.

4         A.    I have written this amendment and

5    personally support full ratification to our

6    Constitution.  My life has changed.  I no longer care

7    that people think I am right wing, radical, extreme,

8    prejudiced, irrational or unjustified in my belief

9    and/or opinions.  I don't believe I wrote that.  That

10   doesn't make sense.

11               I do not know where any of you were

12   born or what kind of life you have lived, but I know

13   where I was born and what kind of life I have lived

14   for the last 37 years.  I'm willing to hijack any

15   enemy plane and crash it into the heart and soul of

16   that enemy's religion, country, cities, and people.

17   I will never forget September 11, 2001.  I will never

18   be the same compassionate, understanding,

19   sympathetic, and trusting human being I was before

20   that day.  I vow to avenge the people of New York

21   City that were killed.  I will give and sacrifice my

22   life so that the children of the United States of

23   America will once again run free in the cities,

24   states, and country of the United States of America.

25   God bless us all and may evil be exstinguished for

1    another 2,000 years and beyond.    Forward or delete,

2    your choice.

3        Q.    And was that email, in fact, sent by

4    you?

5        A.    It may or may not have been.

6        Q.    Who did you send it to?

7        A.    Numerous people.

8        Q.    What -- what people?

9        A.    Numerous people; I don't recall.

10        Q.    Who -- people in your class?

11        A.    Not that I recall, maybe Dave Mangum.

12    But it was not sent to a University of Colorado,

13    Colorado Springs, email address or nor was it sent on

14    a University of Colorado, Colorado Springs, computer.

15        Q.    Did you send it to foreign exchange

16    students?

17        A.    Nor was it sent by a University of

18    Colorado, Colorado Springs, address.

19        Q.    Did you send it to foreign exchange

20    students?

21        A.    I don't believe so, no.

22        Q.    And you reference an amendment.

23        A.    Which is fictitious and not truthful or

24    accurate.

25        Q.    Looking on page 87 under Amendment 11,

1    could you read that, please.

2              A.    To what?

3              Q.    Through the end of it on the following

4    page.  Beginning for every day.

5              A.    For every day after the eleventh day of

6    the ninth month in the year 2001, all noncitizens of

7    the United States of America shall be deported or

8    detained upon request by such noncitizen to their

9    country of citizenship or any other country outside

10   of the borders of all 50 states of the United States

11   of America, its territories, and any other sovereign

12   lands defended by the people of the United States of

13   America.  The only citizens of any country other than

14   the United States of America allowed into said

15   borders are legal citizens of the country known as

16   Mexico and the country known as Canada.  This

17   amendment shall remain amended to the Constitution of

18   the United States of America and Bill of Rights until

19   or unless ratified by the President, the Congress,

20   The House of Representatives, and the Supreme Court

21   of the United States of America.

22              Q.    And did you, in fact, author that

23   amendment?

24              A.    I may have, yes.

25              Q.    And was the presence of noncitizens in

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

123

```
 1          Q.    Do you recognize this document titled

 2   Verified Motion for Emergency Ex Parte Order?

 3          A.    I believe so.

 4          Q.    And have you seen pages 101 through 103

 5   before?

 6          A.    I believe so.

 7          Q.    When did you first see them?

 8          A.    I don't know, August, September of 1997

 9   maybe.

10          Q.    On page 104, do you recognize that

11   document?

12          A.    I believe so.

13          Q.    What is that?

14          A.    An affidavit of Kristen Eller.

15          Q.    And have you read that affidavit

16   before?

17          A.    Probably.

18          Q.    And is it your understanding that this

19   affidavit and the Verified Motion for Ex Parte Order

20   were received by the military in connection with

21   their investigation of you?

22          A.    They may or may not have.

23          Q.    Paragraph 4 on page 104, could you

24   please read that paragraph and tell us if that's an

25   accurate statement.  You can read it into the record.
```

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1     A.    I found out, meaning Kristen Eller

2   found out on Saturday, September 27th that he,

3   referring to me, had cleaned out our joint checking

4   and savings accounts.  There was over $4,700 in

5   savings and $3,600 in checking.  I am afraid that he

6   will dispose of this money, and that he will incur

7   new debts without my knowledge.  I have found out

8   that someone wrote a $5,000 cash advance check on one

9   of my credit cards in August without my signature.  I

10  believe my husband may have done this by forging my

11  name.

12          Q.    Do you believe that's an accurate

13  statement from Kristen Eller?

14          A.    Do I believe that she thinks it's an

15  accurate statement?

16          Q.    Yes.

17          A.    Yes, I believe that she thinks that's

18  an accurate statement by Kristen Eller.

19          Q.    And is it an accurate statement?

20          A.    No, it is not.

21          Q.    Did you ever forge her name --

22          A.    No, never.

23          Q.    -- on -- on one of her credit cards?

24          A.    No, never.

25          Q.    So when she stated that, that wasn't

1    true?

2              A.    Correct.

3              Q.    What -- what happened -- where do you

4    think the $5,000 cash advance went?

5              A.    You know, I don't -- how is this

6    relevant?  The divorce is finalized.  The -- any

7    debts -- everything was all -- I mean, this is all

8    hearsay.  How is this relevant?  There was never any

9    document provided where I forged any signatures,

10   nothing.

11             Q.    What do you think happened to that

12   $5,000?

13             A.    I don't know.  I never talked to her

14   again.

15             Q.    Do you have any idea where that $5,000

16   went?

17             A.    No.

18             MR. SOLA:  Object, asked and answered.

19             A.    You'd have to ask her.

20             Q.    (BY MR. BEHRENDT) Do you think she took

21   the $5,000?

22             A.    I do not know.  I don't even know if it

23   even occurred.  I don't even know if that's truthful.

24             Q.    Did you clean out your joint checking

25   account, savings account?

1      A.    It was my account.

2      Q.    So you did; that is accurate then

3   that you --

4      A.    It was my account, established it in

5   Federal Credit Union which is -- still remains my

6   account.

7      Q.    It's a joint account --

8      A.    In 1988 that account was established.

9      Q.    So you did withdraw that money, the

10   4,700 and --

11      A.    It wasn't a joint account.

12      Q.    Let me finish --

13      A.    She had access to the account during

14   our marriage.

15      Q.    So you did withdraw that 4,700 in

16   savings and 3,600 in checking from the account?

17      A.    It was my account.  I may have.  I

18   don't recall.

19      Q.    The fact that --

20      A.    She had access to get that money.

21      Q.    Let me ask the question.  The fact that

22   Kristen made this statement, are you unhappy about

23   that?

24          MR. SOLA:  Now?

25      A.    Now?

1                    MR. BRADLEY:  It's Exhibit 31.

2                    MR. BEHRENDT:  Exhibit 31.

3          Q.    (BY MR. BEHRENDT) And turning to the

4   second to last page, Mr. Eller.

5          A.    132?

6          Q.    Yes.

7                It appears the document -- correct me

8   if I'm wrong, but it appears the document indicates

9   that there was a -- you committed a theft of

10  firewood.

11         A.    Objection.

12                    MR. SOLA:  Just ask --

13         Q.    (BY MR. BEHRENDT) Is that true?

14                    MR. SOLA:  -- answer the question.

15  I'll object, okay?

16         Q.    (BY MR. BEHRENDT) What happened?

17         A.    I refuse -- it's double jeopardy.  I'll

18  take the 5th Amendment, whatever.  This is

19  ridiculous.

20         Q.    This is a document that apparently was

21  included in your --

22         A.    I don't know where the document came

23  from.  I don't know who it -- what is, what.  I don't

24  have a clue.  I don't know if you provided.  I don't

25  know if you typed this up and stuck it in here.

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

137

```
 1                    MR. SOLA:  Just let him ask a question.

 2           A.    Well, I'm not taking this.  This is

 3   ridiculous.

 4           Q.    (BY MR. BEHRENDT) Have you ever seen

 5   this document before?

 6           A.    No.

 7           Q.    Were you, in fact, charged with

 8   stealing -- theft of firewood?

 9           A.    No.

10           Q.    Were you ever in Mount Crested Butte,

11   Colorado?

12           A.    Yes.  Numerous times.

13           Q.    And --

14           A.    I was just there two years ago, I

15   think -- three years ago.

16           Q.    Is it your understanding that as part

17   of your investigation for your 74 Charlie security

18   clearance that the investigators received this page,

19   132?

20           A.    I don't know.

21           Q.    Is it your understanding that your

22   investigators believed that you were charged with

23   theft of firewood?

24           A.    I don't know.

25           Q.    And that you spent two days in jail?
```

1          A.   I don't know.

2          Q.   Do you think that could have had an

3    affect on whether or not you were denied your

4    security clearance?

5          A.   No.

6          Q.   You do not think that would have an

7    affect?

8          A.   No.  Absolutely none.

9               MR. BRADLEY:  Are you done with that

10   exhibit?

11              MR. BEHRENDT:  I'm sorry, yes.  Did you

12   want to --

13              MR. BRADLEY:  Just a couple.

14                   EXAMINATION (continued)

15   BY MR. BRADLEY:

16         Q.   Mr. Eller, page 75 of Exhibit 31 --

17   actually, I'm sorry, page 85.  This business about

18   the incident at the University of Colorado regarding

19   emails and arguments after 9/11, you don't know one

20   way or another when the Army first learned about

21   that, do you?

22         A.   No.

23         Q.   Okay.  And you don't know one way or

24   another what impact that may have had on any security

25   clearance application you made?

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

148

1    right now looking at it.

2          Q.    Are you sick to your stomach because

3    you think people know about your personal

4    information?

5          A.    A lot of people know about my personal

6    information --

7          Q.    Are you unhappy --

8          A.    -- as you just proved in the numerous

9    exhibits.

10         Q.    And are you unhappy about that?

11         A.    Yes, I'm very unhappy.

12         Q.    And you blame Experian for that?

13         A.    Yes.

14         Q.    Okay.  Have you ever heard of

15   www.jerryeller.com?

16         A.    Yes.

17         Q.    Is that your website?

18         A.    Yes, it is.

19         Q.    Let's talk about that.  Can we mark

20   that Exhibit 33.

21              (Whereupon, Deposition Exhibit No. 33

22   was marked for identification by the reporter.)

23              MR. SOLA:  Were these produced?

24              MR. BEHRENDT:  No.  But those are his

25   own documents.

160

1        A.    Yes, I did.

2        Q.    Did the two of you go through it

3   together?

4        A.    Yes, we did.

5        Q.    Why?

6        A.    Because I was obtaining employment as a

7   telecommunications operator maintainer, and in my

8   preinvestigation I was asked if I had ever been

9   denied credit and I said yes.

10       Q.    Okay.

11       A.    And she asked me about what that meant.

12       Q.    February 20th, I believe you testified

13   in your earlier session in September, February 20,

14   2002, was also the day you were told you were not

15   going to get the air traffic controller job; is that

16   correct?

17       A.    Correct.

18       Q.    Okay.  And were you told that before

19   this credit report got faxed?

20       A.    That I wasn't going to get the air

21   traffic controller job?

22       Q.    Correct.

23       A.    Yes.

24       Q.    Okay.  So that decision had been made

25   before this credit report got faxed?

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1          A.     Yes.   On February 20th.

2          Q.     Okay.   Thank you.

3                 Do you have any knowledge as to how NCO

4    Credit Services creates credit reports like this?

5          A.     No, not specifically, no.

6          Q.     Okay.   Is it your understanding that

7    this document contains information from all three

8    major credit bureaus?

9          A.     Yes.

10          Q.     But you don't know how NCO retrieves

11    and compiles that information, do you?

12          A.     Not specifically, no.

13          Q.     Okay.   First page of this says

14    attention Jessica.   Is that somebody in your

15    attorney's office; do you know?

16          A.     I do not know.

17          Q.     Okay.   All right.   On the -- towards

18    the bottom of the first page in the gray shaded area

19    you see the words TU Empirica score?

20          A.     Correct.

21          Q.     You see 769?

22          A.     Yes.

23          Q.     Do you have any general knowledge

24    ability how credit scores are interpreted?

25          A.     I can speculate.

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

209

```
 1          Q.    And your soon -- you describe someone

 2    as a soon to be ex-wife, who is that person?

 3          A.    Jill Fisher.

 4          Q.    And is she your ex-wife?

 5          A.    Yes.

 6          Q.    And were there other issues that

 7    contributed to the negative impact on your

 8    relationship with your ex-wife?

 9          A.    That were a direct result of Experian,

10    yes.

11          Q.    What were those?

12          A.    It ruined my military career.  It

13    ruined my personality.  It ruined my state of mind.

14          Q.    And your discharge from the military,

15    did that not have a negative impact on your

16    relationship with Jill Fisher?

17          A.    May have.

18          Q.    Did she tell you that it did?

19          A.    May have.

20          Q.    She may have?

21          A.    She may have told me that.

22          Q.    And when you were discharged from the

23    military, you did not receive -- at the time you were

24    discharged, you did not have any security clearance?

25          A.    It was in appeal.
```

1        A.   I don't believe so, no.

2        Q.   What about 2003 or `4?

3        A.   No, I don't believe so.

4        Q.   But you feel at some point it had an

5 impact?

6        A.   May have during the time in March of

7 `97 or `98, whatever year it was.

8        Q.   In one of the documents you've

9 provided, it's indicated that you had a brother that

10 passed away.

11        A.   Yes.

12        Q.   When did that occur?

13        A.   In August of `98, I believe, maybe

14 `99 -- no, I don't --

15        Q.   And what --

16        A.   `99, I think.

17        Q.   What happened to your brother?

18        A.   He succumbed to cancer.

19        Q.   And did that cause you -- I would think

20 that caused you some emotional distress.

21        A.   Everyone dies.  It's a fact of life.

22        Q.   Certainly it's not something you're

23 happy about.

24        A.   Well, I don't -- it's something that's

25 unavoidable, so I don't stress over things that are

213

```
 1   unavoidable.  Eminent -- it's eminent.

 2           Q.   And has --

 3           A.   It was sad.  I wouldn't say I was

 4   stressed out or angry or upset or frustrated or

 5   paranoid or depressed.

 6           Q.   It didn't cause you to be depressed?

 7           A.   No.  I wouldn't say that, no.  It

 8   motivated me to live longer and be happier.

 9           Q.   This was your brother Glenn?

10           A.   Yes.

11           Q.   So you don't believe that his passing

12   away has contributed to emotional distress you've had

13   over the years --

14           A.   No.  I think it's --

15           Q.   -- since his passing away?

16           A.   I think it's strengthened me

17   emotionally and mentally and physically.

18           Q.   Would you describe your experience in

19   your second tour of duty in the Army as a positive

20   experience?

21           A.   No.

22           Q.   Why not?

23           A.   I can't answer that.

24           Q.   Were you unhappy about things that

25   happened during that period?
```

1          A.    I can't -- I mean, I don't know -- I

2    don't know what you're asking.

3          Q.    If your experience in the Army during

4    your second tour of duty was a negative experience,

5    why was it negative?

6          A.    Because of all the injustice and

7    violations of federal law, military law, due process.

8          Q.    Committed by people in the Army?

9          A.    Correct.

10          Q.    You feel -- felt their actions were

11    unjustified?

12          A.    There were numerous illegal, unlawful

13    actions witnessed by me and documented as well by me

14    and provable through documents by me.

15          Q.    When did those -- when did that begin?

16          A.    I'd say the main crux of it began when

17    I was stationed at 125th Signal Battalion in October

18    of 2002.

19          Q.    Did you have any negative experiences

20    during your second tour of duty in the Army prior to

21    October 2002?

22          A.    Yes.

23          Q.    When was that?

24          A.    When I was in Fort Gordon.

25          Q.    What happened at Fort Gordon?

1          A.   I was embarrassed, denied information,

2    denied access, ridiculed, mocked unnecessarily.

3          Q.   And not in regards to your credit

4    report?

5          A.   Yes.  I believe so, yes.

6          Q.   Exclusively because of your credit

7    report?

8          A.   I don't know.

9          Q.   Well, how were you mocked?

10          A.   I was called out in front of a

11    formation of two to three hundred of my peers stating

12    that there was derogatory information in my

13    investigation and my clearance.

14          Q.   But you don't know if that derogatory

15    information referred to interviews that had been

16    conducted as opposed to information in your Experian

17    credit report.

18          A.   No, I'm assuming it was because of my

19    credit report and nothing else.

20          Q.   But you don't know for sure?

21          A.   No.  But there's nothing else that it

22    could be because I didn't have a criminal record.

23          Q.   And approximately what date was that?

24          A.   It was all after July 19th of 2002 all

25    the way to October 2nd of 2002.

1      Q.    Did you have any negative experiences

2  in the Army prior to July?

3      A.    My second tour?

4      Q.    Yes.

5      A.    Not that are significant or memorable

6  or --

7      Q.    When were you discharged from your --

8      A.    Second tour?  September 7, 2004.

9      Q.    From July 2002 through September 2004,

10  would you describe your experience in the Army as a

11  negative one?

12      A.    Yes.

13      Q.    And did your experience cause you

14  emotional distress?

15      A.    Yes.

16      Q.    Would you describe that emotional

17  distress as intense?

18      A.    Yes.

19      Q.    And the emotional distress was the

20  result of things people had said to you and done to

21  you?

22      A.    I believe it was because of the results

23  of my credit report.

24      Q.    What do you mean the results of your

25  credit report?

1          MR. SOLA:  Same objection.

2          A.    They have my address on it.  Usually

3    when I get emails sent through a computer, there's

4    other addresses or similar addresses to mine.

5          Q.    (BY MR. BEHRENDT) But you don't know

6    for sure?

7          A.    No.

8          Q.    When did you divorce your second wife?

9          A.    I believe it became official June of

10   this year.

11         Q.    And was that a consensual divorce; is

12   that something both of you wanted to do?

13         A.    I don't know.

14         Q.    Who initiated the proceedings?

15         A.    I guess I did.

16         Q.    At her request?

17         A.    No, not really.  I don't think so.

18         Q.    Were you unhappy that you divorced?

19         A.    Yes.

20         Q.    And did that cause you emotional

21   distress?

22         A.    May have.

23         Q.    And that's something that your --

24   strike that.

25               Let me hand you through your counsel

1     A.   Yes.

2     Q.   Okay.  And that happened on May 3,

3  2004?

4     A.   I believe so, yes.

5     Q.   Okay.  And was she telling the truth

6  when she told you that; did you ever threaten to kill

7  someone on March 3, 2004?

8     A.   I don't believe I did, no.

9     Q.   You don't recall ever doing that?

10     A.   I don't believe I did, no.

11     Q.   Do you know anything --

12     A.   I was accused of it, but I don't

13  believe I did.

14     Q.   Okay.  Do you recall any sort of

15  incident on March 3, 2004, that involved threats or

16  alleged threats?

17     A.   I remember it vividly.

18     Q.   Okay.

19     A.   Very clearly.

20     Q.   What was the incident?

21     A.   Which -- where do you want to start, at

22  6 a.m. when I woke up?

23     Q.   Can you say in general terms what went

24  wrong that day.

25     A.   Do you want to start on March 2nd?

1        Q.   Is that when the incident began?

2        A.   Well, it all began on December 9th when

3  they revoked my clearance.

4        Q.   Okay.  Well --

5        A.   And I complained on December 10th.

6        Q.   Ms. Dressel appears to have said that

7  you threatened to kill someone on March 3rd of 2004,

8  so if we could just for the sake of time just focus

9  on that date, if you could describe for me what

10  incident occurred on March 3rd of 2004.

11       A.   She is basing that information upon

12  information that was provided to her by Captain

13  Michael Voss.

14       Q.   Did you have an incident with Captain

15  Voss on March 3rd of 2004?

16       A.   He was not present when this supposedly

17  occurred.

18       Q.   Who was present?

19       A.   Command Sergeant Major Stewart and

20  Chaplain Major Siminoux.

21       Q.   What happened with those two persons?

22       A.   I don't know.

23       Q.   Did you meet with those two gentlemen

24  on that day?

25       A.   Yes, I did.

1         Q.    What was the purpose of that meeting?

2         A.    I had no more distrust -- I had no more

3    trust for my chain of command, which included Captain

4    Michael Voss, First Sergeant Joseph Quesnell, Command

5    Sergeant Major Hatie Williams, and Colonel --

6    Lieutenant Colonel Bevan Daley.

7         Q.    Were you being disciplined on March 3,

8    2004?

9         A.    Supposedly.

10        Q.    And why were you being disciplined?

11        A.    Well, I wasn't disciplined that day but

12   I was accused on March 9th of violating the uniform

13   code of military justice on March 3rd.

14        Q.    Okay.  And what were you accused of

15   doing on March 3rd?

16        A.    I believe disrespecting an NCO and

17   leaving assigned place of duty.

18        Q.    Is there anything else you were accused

19   of doing on that day?

20        A.    I was accused of threatening to kill

21   someone.

22        Q.    Anything else?

23        A.    Not that I know of.

24        Q.    Do you know who you were -- you were

25   accused of threatening to kill?

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

1          A.   No.

2                    MR. BRADLEY:  Okay.  That's all.

3     Thanks.

4                    MR. BEHRENDT:  If you could put that

5     exhibit to the side for the moment, I just wanted to

6     touch on a couple other things very quickly.  I have

7     another document I would ask to be marked as --

8                    MR. SOLA:  I'm going to object to you

9     offering that.  I'm going to object.  I mean,

10    someone's politics.  What's the relevancy of that?

11                   MR. BEHRENDT:  Well, we want to know if

12    he is the same Gerald H. Eller because this, after

13    all, is allegedly a mixed file case.  And I'm trying

14    to find out is this you --

15                   THE DEPONENT:  Yes.

16                   MR. BEHRENDT:  -- or is this someone

17    else.

18                   THE DEPONENT:  It's me.

19                   MR. SOLA:  What's the relevance if he

20    ran for Congress; is that what you mean?

21                   MR. BEHRENDT:  No.  This is a

22    publication -- take another look at it.  I just want

23    to see if that is him or if there's another Jerry

24    Eller.  That's what this case is about.

25                   THE DEPONENT:  Why, did Jerry Willard

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119