described, how far back does that go, to what year?

A. That they purposely, back to 2002.

Q. What about other than purposely?

A. I don't know. I can't -- I don't know if it was purposeful or not. I know it occurred, but I don't know if they intentionally or purposefully did it.

Q. Has -- have you had any problems in your life since the year 2000 which you do not in some way attribute to Experian?

MR. SOLA: I'll object, vague.

A. Not really.

Q. (BY MR. BEHRENDT) So pretty much everything you attribute to Experian?

A. Pretty much.

Q. And -- and the harm that you allege or the wrongful conduct that you allege Experian engaged in was the reporting of inaccurate information about you?

A. Yes.

Q. Going back, if we could, to exhibit -- strike that.

Are you -- do you know a John Cimino, C-I-M-I-N-O?

A. Yes.

A. Yes.

Q. Same Jerry Eller, right, you?

A. Same person.

Q. Okay.

A. Different address.

Q. Taking a look at our current exhibit, which is the complaint from SPC Gerald H. Eller, do you recognize that document?

A. Yes, I do.

Q. Is that your signature at the bottom?

A. Yes, it is.

Q. Is it true that in this complaint, you allege that you have been discriminated against by your subordinates and chain of demand because of your race, age, or physical disability?

A. And/or, yes.

Q. And that as a result, you did not receive, among other things, a top secret security clearance?

A. That's what I was told on December 9th.

Q. And this statement and your complaint that you made, you believe it's an accurate statement?

A. To the best of my ability, yes.

Q. Thank you.

I want to hand you another document that says statement of SPC Gerald H. Eller dated December 10, 2003, and ask our court reporter to mark that as the next exhibit in order.

(Whereupon, Deposition Exhibit No. 37 was marked for identification by the reporter.)

MR. BEHRENDT: Is that 37?

THE REPORTER: Yes.

MR. SOLA: Hold on. I missed one. The last one was 36?

THE DEPONENT: Yeah.

Q. (BY MR. BEHRENDT) Do you recognize the document labeled as Exhibit 37?

A. Yes.

Q. What is this document?

A. A statement from me.

Q. Is it correct that Captain Voss told you -- are the statements contained in this statement correct and accurate?

A. To the best of my knowledge, yes.

Q. So you were told by Captain Voss that your top secret security clearance was -- the investigation was halting, discontinuing, or being denied because of your being discharged for a physical disability?

A. It says because it was rumored that I was being discharged for a physical disability.

Q. And that's what Captain Voss told you?

A. No. He said I was being discharged for physical disability.

Q. And that was the reason why he -- the Battalion commander was halting, discontinuing, and denying you your top secret security clearance?

A. I don't know the conversation between Captain Voss and Lieutenant Colonel Daley.

Q. But Captain Voss --

A. It's hearsay.

Q. The reason Captain Voss gave you was because it was rumored you were being discharged for physical disability?

A. He told me that Lieutenant Colonel Daley said he was stopping my clearance, meaning Lieutenant Colonel Daley because I was being medically discharged.

Q. And that's what you were told?

A. On December 9th. And that is a false, untrue, fabricated lie.

Q. They lied?

A. Yes.

Q. Who lied?

A. Lieutenant Colonel Daley and Captain Voss because I was on temporary profile.

Q. And that -- you were unhappy about them lying?

A. No. I was on temporary profile. They had no legal justification to do anything to my clearance. That's why it goes back to that complaint --

Q. Do did --

A. -- about Army regulations and security clearances --

Q. So --

A. -- and flags --

MR. SOLA: Let him finish.

A. -- and et cetera.

Q. (BY MR. BEHRENDT) So did the conduct of these people, your -- those in your chain of command, did that cause you emotional distress?

A. Yes.

Q. A lot?

A. And I discussed my clearance or my credit report for the very first time with Captain Michael Voss on December 9th.

Q. Did that cause you a lot of emotional distress?

A. Yes. Extraordinary, undescribable.

Q. I have another document I would ask to be marked as Exhibit 38, which is the developmental counseling form dated December 17, 2003.

A. Outstanding.

(Whereupon, Deposition Exhibit No. 38 was marked for identification by the reporter.)

MR. BRADLEY: December 17, `03?

Q. (BY MR. BEHRENDT) Do you recognize that document, Mr. Ell --

A. Yes, I do.

Q. Just to reiterate, let me finish my question; I'll let you finish the answer. And our court reporter will have an easier time of taking it all down.

Do you recognize that document you have there?

A. Yes, I do.

Q. What is that document?

A. It is a counseling statement signed by Captain Michael Voss from December 17, 2003.

Q. Why were you counseled?

A. According to the counseling statement or according to the hour-lengthy conversation?

Q. Counseling statement.

A. Well, it says summary of counseling, key points of discussion, this is a written counseling to reiterate the verbal counseling with Lieutenant Colonel Daley concerning your recent IG and EO case.

Q. Is it true that Lieutenant Colonel Daley directed his subordinates not to continue a request for your local interim security clearance because you were pending an MAB board?

A. I don't know. You'd have to ask him.

Q. Is that what you were told?

A. No.

Q. What were you told?

A. I was told that the actual NSA clearance that is granted after an exhaustive check can take from 6 months to 18 months to be completed. So to add 6 to 18 months to November 11, 2001, meant I should have had my clearance in 2002 or early 2003.

Q. So you think --

A. And as far as December, late 2003, I did not have any clearance.

Q. So you believe that was an inaccurate statement?

MR. SOLA: Objection, vague.

A. Lieutenant Colonel Daley lied to me on

December 17, 2003.

Q. (BY MR. BEHRENDT) How did he lie to you?

A. He stated that my clearance had a flag in it, and my background investigation was not complete which was a lie.

Q. Why do you say that's a lie?

A. Because it was completed on December 16, 2003. And it's in one of your exhibits that you produced earlier that we discussed in the deposition.

Q. So you believe he was lying to you?

A. I know for a fact he was lying.

Q. Did that --

A. There's no belief about it.

Q. Did that make you unhappy?

A. Infuriating.

Q. And that caused you emotional --

A. Irate. And I'm getting irate thinking about it again. Maybe we should take a break.

Q. And do you --

THE DEPONENT: Can we take a break?

MR. SOLA: Sure.

THE DEPONENT: This is very traumatic reliving this garbage.

MR. BEHRENDT: I think we actually should try to get through this before --

MR. SOLA: As you can see -- so he needs a break. As he indicated, this was pretty -- very disturbing.

MR. BRADLEY: But the walkout is on the video, right?

THE VIDEOGRAPHER: We're off the record at 4:22 p.m.

(Whereupon, a recess was taken from 4:22 p.m. to 4:28 p.m.)

THE VIDEOGRAPHER: We're back on the record at 4:28 p.m.

Q. (BY MR. BEHRENDT) Going back to your encounter with Lieutenant Colonel Daley, that incident, you've included that on your website under your time line section.

A. I may have, yes.

Q. Is that something that still makes you upset today when you think about it?

A. Yes.

Q. And that's caused you some emotional distress?

A. It's a key day.

Q. Why is that a key day?

sworn statement?

A. Yes, I believe so, yes.

Q. Okay. What was the purpose of this sworn statement?

A. Because of the equal opportunity claim I filed which was Exhibit 36.

Q. And you claim you were being discriminated against because of race, gender, age, disability?

A. No. Because of race, age, and/or physical disability.

Q. And part of the discrimination was -- and were you unhappy about the discrimination that you alleged occurred?

A. Yes.

Q. Did it cause you emotional distress?

A. Yes.

Q. Did you feel the fact that, as you say, you were the only white E4 through E1 among your subordinates lead you believe that you had been discriminated against?

A. Yes.

Q. Were you unhappy that you heard people speaking languages other than English during duty hours and in uniform?

A. Yes. That's a violation of the uniform code of military justice.

Q. And that caused you emotional distress to see that in the military?

A. Yes. Because people were breaking the law and getting away with it.

Q. All right. Did you accuse a SPC Major of violating the uniform code of military justice?

A. She did multiple times, yes.

Q. You alleged that she said she hated white people.

A. Yes, she did say that.

Q. And did that cause you emotional distress?

A. Yes.

Q. Do you blame Experian for her saying that?

A. Yes.

Q. And were you also called Jerry Elder, E-L-D-E-R?

A. Yes.

Q. And who called you Jerry Elder?

A. Numerous people.

Q. And did that make you unhappy?

A. Yes.

Q. And did this occur throughout your second tour of duty --

A. Yes.

Q. -- at Schofield Barracks?

A. Yes.

Q. Do you blame Experian for those comments as well?

MR. SOLA: Object, vague.

A. Yes. Had I gotten the air traffic controller job, I would have never been stationed at Schofield Barracks or 125th Signal Battalion, so yes.

Q. (BY MR. BEHRENDT) And you prepared these documents that you have as part of that exhibit either in handwriting or by typing them?

A. Yes. You should have the document that concluded the outcome of this investigation which substantiates many of my claims.

Q. And this document includes various instances of what you believe to be violations of the uniform code of military justice?

A. Yes.

Q. And every time that happened, it caused you emotional distress?

A. Yes.

Q. Would you say that it was severe

emotional distress?

A. Yes.

Q. And you blame Experian for that?

A. Yes.

Q. Do you believe that your colleagues in the military committed theft and misuse of property?

A. Yes. And it was proven.

Q. Who proved it?

A. It was proven. And you should have the documents stating from, I believe, it's Colonel Neil Lazendorf that states founded, accusation founded.

Q. And do you blame Experian for their conduct in that respect?

A. Not their conduct, but I blame them for placing me at 125th Signal Battalion when I should have been at Fort Rucker, Alabama.

Q. Why would you have been at Fort Rucker, Alabama?

A. Because I would have been training to become an air traffic controller, and I would've never got stationed in the 125th Signal Battalion.

Q. Isn't it --

A. It's a different corp.

Q. Isn't is true the reason why you didn't become an air traffic controller was because you

flunked the hearing test and did not receive a waiver?

MR. SOLA: I'll object, asked and answered.

A. That's not what I believe to be true, no.

Q. (BY MR. BEHRENDT) Is that what you were told?

A. That's what I was verbally told, yes.

Q. But you believe it's because of something Experian did?

A. Yes.

Q. During your time in the military dealing with the individuals identified in your sworn statement, did you become paranoid?

A. Yes.

Q. How so?

A. They were lying to me.

Q. And did you believe they were denying you information?

A. Yes.

Q. And did that cause you emotional distress?

A. Yes.

Q. Could you turn to the final page of

MR. BRADLEY: Before you leave that exhibit, can I ask a followup question?

MR. BEHRENDT: Sure.

EXAMINATION (continued)

BY MR. BRADLEY:

Q. Mr. Eller, is it safe to say that all of the emotional distress that you suffered, that you're claiming in this case was caused by the fact that you didn't get that air traffic controller job?

MR. SOLA: I'll object, misstates prior testimony.

Q. (BY MR. BRADLEY) If you had gotten that job, would we be here today?

A. I don't believe so, no.

MR. BRADLEY: Okay. That's all.

THE DEPONENT: May still be in Army. May still be filing a complaint.

MR. BRADLEY: Let me clarify the question.

MR. SOLA: I see. He wouldn't be here.

MR. BRADLEY: Let me clarify the question.

MR. SOLA: Okay.

Q. (BY MR. BRADLEY) Is all the emotional distress that you suffered that you're alleging in

A. Because had I gotten the air traffic controller position, I may have never hurt my hip in Hawaii because I may have never been sent there.

Q. Do you blame Experian for your flunking of the hearing test required for the air traffic controller position; do you blame them for that?

A. We don't know. There's no physical evidence of me failing any hearing test.

Q. Do you blame Experian for your flunking of the hearing test?

MR. SOLA: Object, assumes facts not in evidence.

A. The only evidence we have is that I have a waiver proving that I have -- that my hearing was not contingent upon my enlistment in the Army. And we have physical evidence of that, and you should have that document.

Q. (BY MR. BEHRENDT) Isn't it true that you were told you were not going to receive a waiver for your flight IV physical?

A. I was told that I had the air traffic controller job.

Q. But were later --

A. Told on February 17 --

Q. But were later told that --

A. -- 2002.

Q. But were later told that you, in fact, did not receive the waiver?

A. On February 20th.

Q. And you believe that's because of something that Experian did?

A. Yes.

Q. Prior to your second tour of duty in the Army, did you fill out and submit an Army application?

A. Yes.

Q. Do you have that document?

A. Which one?

Q. The application.

A. From 1988 or from 2001?

Q. 2001.

A. No, I do not.

Q. Where is that document?

A. I don't know.

Q. Just let me finish my question.

Have you ever requested the document?

A. I believe I may have.

Q. When did you request it?

A. In my FOIA requests.

Q. Did you ever receive it?

What was the purpose of this -- the counseling that you received on that date?

A. It says performance counseling.

Q. And what was the issue with your performance?

A. It says during your investigation your top secret clearance was stopped due to pending MEB.

Q. What is MEB?

A. Medical evaluation board.

Q. And did you believe that was the reason why it was stopped?

A. No. That was untruthful and inaccurate.

Q. Was that a lie?

A. Yes.

Q. Who told that lie?

A. Captain Voss and Colonel Daley on December 9th and December 17, 2003.

Q. Did that make you unhappy?

A. Yes.

Q. Did it cause you emotional distress?

A. Yes.

Q. On the next page under session closing, is that your signature there?

A. Yes.

Q. Okay. And the next page after that, is that page in order?

A. That's one -- that's a front and back. That's one -- that's considered one.

Q. So as you received it, one, two, and then what about the third page?

A. That's what I said, they're out of order.

Q. Do you know where --

A. The --

Q. Where does the third page go?

A. This goes behind the February 12th counseling.

Q. Page 3 goes behind what is currently page 1?

A. This is one page. To copy it, I had to use two different --

Q. I understand. So it's the same document?

A. It's front and back.

Q. No problem.

A. No. They're different documents. The pages are dated the same date, but they are different documents. Yes.

Q. Okay. And they both pertain to your

February 12, 2004 --

A. I was counseled twice that day.

Q. Okay.

A. By Staff Sergeant McCann on why I couldn't get promoted.

Q. Okay.

A. And I didn't know it at the time, but I had a clearance; but I was not told.

Q. Were you unhappy that you weren't told?

A. I didn't know.

Q. Well, when did you find out?

A. I continued to be told -- I found out on March 2nd.

Q. What year?

A. Of 2004.

Q. Did that cause you emotional distress when you found that out?

A. Yes.

Q. How so?

A. Because I had a clearance, and nobody told me. I had a clearance since January 14th of 2004.

Q. You don't blame Experian for these people lying to you, do you?

A. Yes, I do.

Q. How is Experian responsible for them lying to you?

A. Had I gotten the air traffic controller job or had not had inaccurate or untruthful information, my background investigation would have been completed in 6 to 12 months; would have never reported false or inaccurate information about me and I would have gotten the jobs that I was qualified to obtain. But since I had to move around and go to school and wait years and years and years for my credit to get straightened out --

Q. When you were at the MEF station, were you told that your flight IV physical waiver was not approved?

A. Yes. On February 20th.

Q. Did you ever receive anything in writing indicating that your fight IV physical waiver had not been approved?

A. No.

Q. Have you ever requested such documents?

A. Yes, numerous times.

Q. Have you received them?

A. No. I requested them through military counsel at the 25th Infantry JAG office with Captain Hamner. And one of your exhibits should explain

that.

Q. Going to the development counseling form dated March 2, 2004, do you recognize that document?

A. Yes.

Q. And is it true that on that date you were -- your secret and top secret -- access to secret and top secret material was being suspended?

A. Actually, I would like to make a correction to a previous statement I made. I was notified that I had my clearance on February 27th of 2004. And I was notified by my wife who was residing in the state of California at the time.

Q. Was she having --

A. And that said --

Q. Was she talking with Captain Voss?

A. She said that Lieutenant Colonel Daley had told her that day that I had a clearance. And nobody in my unit from February 27th to March 2nd notified me or told me. And I filed a complaint in the inspector general's office, I believe on February 28th or March 1st, asking why I had not been notified by my chain of command, and why my nonmilitary spouse notified me that I had a clearance. And nobody has absolved or resolved that

request.

Q. And that made you upset?

A. Yes.

Q. And you're upset about that today?

A. Yes.

Q. You've been upset about that since the day it happened?

A. Yes.

Q. And that's caused you some great emotional distress?

A. Yes.

Q. Looking at the March 22, 2004 developmental counseling form, were you not informed on that day that your access to secret and top secret material would be suspended?

A. Yes, I was informed.

Q. And were you unhappy about that?

A. Not really, no.

Q. So you didn't mind?

A. Didn't matter at that point. I was more upset that I was notified that my clearance had been adjudicated and granted.

Q. And no one told you.

A. He told me on that counseling statement.

Q. Okay.

A. It says right there. I was notified on February 27th.

Q. And --

A. And the same day my wife was notified by Lieutenant Colonel Daley. This is not Lieutenant Colonel Daley. This is Captain Michael Voss.

Q. Next document is March 9, 2004 developmental counseling form.

A. Yes.

Q. Was that the day when you were told that you weren't being recommended for a promotion?

A. No.

Q. Well, were you told on that day you were not being recommended for promotion?

A. I guess so, yes.

Q. Do you recall that? Does reviewing the summary of counseling refresh your recollection?

A. That was a very long day.

MR. SOLA: Let me see that.

A. That was the day I signed and asked for a court martial by trial which disappeared. That was the same day I was mentally evaluated by a Captain Bacon stating that I was perfectly normal and that I was not a threat to kill anyone. And that was the

same day that Captain Voss had my clearance revoked and sent it to Valerie Dressel stating that I threatened to kill someone.

Q. And did those events cause you emotional distress?

A. And I was also -- said that I brought accusations against numerous people for numerous reasons. Yet you have a document from a colonel in Washington, DC, that totally contradicts this document. And my charges were founded, and they were valid and --

Q. And did all those --

A. -- accusations.

Q. And did all of those --

A. So yes, I am livid and infuriated and very upset with all these contradicting documents that seem to contradict every date and time and everything. So yeah, I'm upset --

Q. And is your --

A. -- to say the least, still upset.

Q. The upset feelings that you have felt since the day that happened, would you say that they've dominated your life?

A. No. What dominated my life was in November 19th of 1999, when I found out that my

Q. (BY MR. BEHRENDT) Were you unhappy when you were not recommended for promotion?

A. Yes.

Q. Was one of the reasons your inability to control your anger?

A. No. It was because I've been lied about and lied to since 1999 is why I can't control myself.

Q. And that's caused you emotional distress?

A. Yes.

Q. Moving to developmental counseling form dated February 12, 2004. Is this the second counseling that you indicated you had on that day?

A. Which one?

Q. It's February 12, 2004.

A. Which one? There's two of them.

MR. BRADLEY: March 9th.

Q. (BY MR. BEHRENDT) Performance counseling?

MR. BRADLEY: Are you going back one?

A. Which one? There's two performance counselings.

Q. (BY MR. BEHRENDT) The one that begins SPC Eller, you're being counseled for failing to be

able ~~to~~ attend the promotional board.

A. Okay. What about it?

Q. Do you recall that counseling session?

A. Yes. And it states you are unable to attend the promotion board due to not having a top secret clearance for your MOS.

Q. And what is MOS?

A. Military occupational skill, which is telecommunications operator maintainer or 74 charlie. And I did have a clearance. It's proven by some of the documents I provided you which was granted on January 14th which was one month prior to this counseling statement. So I was eligible to be promoted. So this is a false, inaccurate, untruthful counseling statement.

Q. And you're not happy about that?

A. That's why I disagreed on the second page. It says I disagree with the information --

Q. Fair enough.

~~A.~~ -- above because I knew it was untrue.

Q. But Experian had nothing to do with that, correct?

A. Yes, they did. Because they messed up my credit report, and refused to correct and did not fix it.

Q. Isn't it true they did --

A. No, they did not.

Q. -- respond to disputes that you made regarding your credit report?

A. It was too late.

Q. And is that not you or Mr. Mason's fault for not bringing it to Experian's attention?

A. No. It's Experian's fault. Because Michael Kleinman notified them in 2002, and they refused to correct the information on multiple occasions.

Q. Okay. We'll get back into that at the end of this deposition.

But let's move along with the developmental counseling form dated March 9, 2004. What was the reason for this developmental counseling?

A. What's developmental counseling? There's promotional counseling and outcome of 15-6 investigation.

Q. Below the -- yeah, the outcome of the 15-6 investigation.

A. It's all lies. It's fabricated, untruthful information.

Q. Doesn't it -- weren't you told that the

investigating officer noted that the allegations you made were whole or in part unfounded?

A. That's not true. They were founded.

Q. So you disagreed with their conclusion?

A. No. Colonel Neil Lazendorf disagreed. You should have the document. I believe it's dated March something, 2004. I think it's dated before this counseling actually.

Q. And that you weren't happy about being told that, were you?

A. I was not happy being lied to, no.

Q. And it upsets you to talk about it?

A. Yes.

Q. And you've included this information in your time line on your website?

A. Yes, I believe so.

Q. So you revisit it often?

A. What?

Q. The events that occurred during your second tour of duty including the counseling.

A. They still go unresolved --

Q. So they're bothering you --

A. Undetermined.

Q. They're bothering --

A. Yes.

Q. So you think she's wrong?

A. No, I don't think she's wrong.

THE VIDEOGRAPHER: Two minutes.

A. She's describing her emotional state and her emotional feelings.

Q. (BY MR. BEHRENDT) Your inability -- with this letter in mind, your inability to obtain a security clearance affected the ability to obtain the employment you wanted after your discharge from the military, correct?

A. Along with not being able to be promoted or going through all this unnecessary anguish, not becoming an air traffic controller.

Q. Okay.

A. Yes.

MR. BEHRENDT: Let's break for the tape turn over, and we'll just start right up.

THE VIDEOGRAPHER: This is the end of tape No. 3. We're off the record at 5:23 p.m.

(Whereupon, a recess was taken from 5:23 p.m. to 5:27 p.m.)

THE VIDEOGRAPHER: This is the beginning of tape No. 4. We're back on the record at 5:27 p.m.

Q. (BY MR. BEHRENDT) Mr. Eller, at some

point during your second tour of duty, were you arrested and put into a mental ward?

A. I was arrested -- well, I was detained twice against my will.

Q. When did that happen?

A. On March 3, 2004, and August 4, 2004.

Q. Why were you detained in March?

A. Because I was accused of threatening to kill someone.

Q. Who accused you of that?

A. I don't know.

Q. Who told you that you were being accused of that?

A. Valerie Dressel on May 3rd, I believe, 2004.

Q. And did that cause you emotional distress?

A. Yes.

Q. And does it continue to cause you emotional distress today?

A. Yes.

Q. And were you put into a mental ward at that time?

A. On March 3rd, yes.

Q. And why were you put into a mental

ward?

A. Because I supposedly was accused of threatening to kill someone.

Q. But that -- it's your position that you did not threaten to kill someone?

A. No, I did not.

Q. How long were you in that ward for?

A. 24 hours or more.

Q. What happened after you were released?

A. I went back to work.

Q. And you were detained again in September?

A. August 4th.

Q. Why?

A. For disrespecting an NCO and creating a public disturbance.

Q. What happened?

A. I was arrested at the 25th Infantry Division Military Police Station and handcuffed and read my rights.

Q. What was the reason given for you being arrested?

A. For disrespecting an NCO and creating a public disturbance.

Q. What specifically was alleged to have

happened?

A. Disrespecting an NCO and creating a public disturbance.

Q. How did you disrespect the NCO allegedly?

A. I don't know. That's what he said.

Q. Who's he?

A. The NCO that I supposedly disrespected.

Q. What's his name?

A. I can't remember. I don't know. There's no arrest record. There's no record of it.

Q. Do you blame that NCO for your arrest?

A. No. I blame Experian.

Q. Do you blame Experian for you being detained in a mental ward?

A. Yes. And I blame them for being diagnosed as mentally retarded and a liar as well.

Q. You blame Experian for that?

A. Yes.

Q. You don't think anyone else is responsible for that?

A. No. Because had I had a truthful and accurate credit report since 1999, that would have never occurred.

Q. But nobody ever told you that, did

Q. So you believe your parents were misinformed on that?

A. Yes. Because on December 17th, when I was in counseling session with Lieutenant Colonel Daley, he changed his story. That's when he said I had a flag in my investigation. He didn't say I didn't get my clearance because of my medical problem. He said there was a flag in my investigation.

Q. Were you ever told that during --

A. An example of a flag he gave was a credit report.

MR. BEHRENDT: I move to strike. There's no question pending.

Q. (BY MR. BEHRENDT) Were you told during the time that you were in the military on your second tour that you were dangerous to yourself and others?

A. Was I ever told that?

Q. Yes.

A. Yes.

Q. Who told you that?

A. Captain Michael Regal.

Q. And do you believe that was a true statement?

A. No.

Q. Do you believe he lied?

A. Yes.

Q. And did that cause you emotional distress?

A. Yes.

Q. Do you blame Experian for that person lying --

A. Yes.

Q. -- according to you?

A. Yes. Because I would have never met that person had I had a truthful and accurate credit report since 1999.

Q. And you don't hold that person in any way responsible for the statement they made about you?

A. I don't -- maybe, sure, yes. Ridiculous.

Q. Isn't it true that your November 19, 1999 Experian credit report was never reviewed by the military?

A. Maybe.

Q. I want to move to --

A. Maybe not. They might have reviewed it during the investigation process.

Q. You don't know one way or the other?

A. No. He helped me. Because he saw that my chain of command was lying and conspiring against me the whole time, and now I had physical proof and evidence.

Q. And you consider this document, document Exhibit 45, to be your proof and evidence?

A. Of proof that my chain of command lied and conspired against me -- conspired against me, yes, I do.

Q. Okay.

A. And my notes and documents prove that.

Q. Going to page 2 under mental evaluation, do you see where it says when in counsel with these NCOs and officers, he, meaning you, made a verbal statement, quote, what do I have to do, kill someone or words to that effect?

A. Do I see that?

Q. Yes.

A. Yes.

Q. Did you ever say that?

A. I don't believe so, no. I did not say that.

Q. Who accused you of saying that?

A. I don't know. That's a good question.

Q. Were they NCOs and officers?

A. I don't know. No one's ever provided me any videotape or recording or statement or anything. All they said is that I said that.

Q. Did Michael --

A. There's no physical proof of me saying this or documentation or anything.

Q. And being accused of saying that, does that cause you emotional distress?

A. Yes. How would you like to be accused of something you didn't say or do?

Q. You don't blame Experian for that, do you?

A. Yes, I do.

Q. How is Experian responsible?

A. Because they have been accusing me of false and untruthful facts since November 19th of 1999. And had they been truthful and factual, I would have never been stationed at 125th Signal Battalion.

Q. That's your belief?

A. Yes.

Q. Did -- at that time that you made -- purportedly made that statement or made the statement according to Michael Voss, was it at that time you were ordered to an emergency medical evaluation?

A. Yes.

Q. And all --

A. Illegally.

Q. And all weapons were removed from your quarters?

A. No, not at that time.

Q. Shortly thereafter?

A. 24 hours later approximately, yes.

Q. Were you unhappy about that?

A. Didn't care at that point.

Q. Well, at some point you wanted those weapons back, right?

A. Yes, I did.

Q. You had some trouble getting them back?

A. Yes, I did.

Q. You weren't happy about that?

A. No, I wasn't.

Q. That caused you emotional distress?

A. Yes, it did.

Q. And you blame the people in the Army for that?

A. No. I blame Experian for reporting false and untruthful information about me and having me get stationed at 125th Signal Battalion.

Q. You blame Experian for people in the

Army not returning your weapons to you?

A. Yes.

Q. Because of something in your 1999 credit report?

A. Because I never got my clearance. There's numerous indications that I should have had my clearance. Even Colonel Daley states in his counseling statement that I should have had it in 6 to 12 months.

Q. And you're still suffering emotional distress about not receiving your weapons today?

A. No.

Q. When did you stop having emotional distress because --

A. When I received my weapons.

Q. Which occurred how long after you requested them?

A. I believe it was on August 5th.

Q. Which is how many months?

A. After I requested it?

Q. After they were taken away.

A. After I requested it, it was more than 24 hours, which was 24 hours too long. I agreed that they could maintain my weapons until I was no longer in the unit. And I was no longer in the unit on

August 4th at 12:30 p.m. when Captain Frankie Cruise signed my papers clearly stating that there was no UCMJ action pending or otherwise or ever --

Q. Was your --

A. -- convicted or anything.

Q. Was your --

A. And I was demoted --

Q. Was your --

A. -- the next day.

Q. Was you -- were you unhappy about being demoted?

A. Yes.

Q. Caused you emotional distress?

A. Yes.

Q. Do you think that affected your ability to obtain certain employment since your discharge from the Army?

A. No.

Q. Did it reduce the chances that you could continue a career in the Armed Forces?

A. No.

Q. That was because --

A. I couldn't continue a career in the Armed Forces if I wanted to.

Q. Because of your medical injury?

traffic controller job because of what Experian reported to the office OPM on December 18th, I believe, 2001.

Q. But you don't have any proof of that, right?

A. Well, the -- my credit report is in my application in my -- and I requested it through JAG. I requested it through Congressman -- United States Congressman Ed Case. Nobody provided any --

MR. BEHRENDT: I have --

A. Any documentation.

MR. BEHRENDT: I have another document, Report of Unfavorable Information for Security Determination. Be asked that it's marked as Exhibit 47.

(Whereupon, Deposition Exhibit No. 47 was marked for identification by the reporter.)

THE DEPONENT: Right there.

MR. SOLA: Okay.

THE DEPONENT: January 13th.

Q. (BY MR. BEHRENDT) Do you recognize that document?

A. Yes, I do.

Q. What is it?

A. I believe it's a partial report of

unfavorable information for security determination.

Q. And what was the basis of the report?

A. Supposedly there was a command referral to mental evaluation for -- mental health for evaluation on March -- 3 March `04, the ANI, which I'm assuming is me, was command referred to Division Mental Health Clinic after verbal expressions of anger and a statement to the effect of what do I have to do, kill someone.

Q. And that's when you were committed for a mental health evaluation?

A. On March 3rd, yes.

Q. And your security --

A. But the command referral statement is dated March 4th. And there is no UCMJ action or negative counseling statements or nothing on -- and it's signed by Captain Michael Voss. And it clearly violates two DOD directives, and it clearly states there's no negative counseling or any history of anger or anything on this statement.

Q. And did that cause you emotional distress?

A. Yes.

Q. And continuing until today?

A. Yes.

Q. And communications is a big part of being an air traffic controller for the United States Army, correct?

A. It's a big part of every job in the United States Army.

Q. And you, in fact, flunked your flight IV physical because of your hearing.

A. I don't know that.

Q. That's what you were told.

A. That's what I was told.

Q. And nobody's ever told you otherwise.

A. Some people have indicated that it was because of my credit report, yes.

Q. Nobody said it was because of your credit report.

A. They said it could have been.

Q. But not that it was?

A. Well, they didn't say that it could have been because of my hearing either.

Q. When Mr. Sola was asking you questions a moment ago -- strike that.

You've indicated that you've incurred emotional distress through the course of this litigation; is that right?

A. Yes.

CERTIFICATE

STATE OF COLORADO )
) ss.
CITY & COUNTY OF DENVER )

I, Carmen Murphy, a Registered Professional Reporter and a Notary Public within and for the State of Colorado, do hereby certify that previous to the commencement of the examination of the said GERALD H. ELLER, a witness called for examination herein in the said suit in the said District Court, was duly sworn by me to testify the truth in relation to the matters in controversy now pending and undetermined between the said parties so far as he should be interrogated concerning the same;

That the said videotaped deposition was taken in shorthand by me to the best of my ability at 6851 Tower Road, Denver, Colorado, on the 21st day of November, 2005, at 9:45 a.m., and was reduced to typewritten form under my supervision;

That the foregoing is a true transcript of the questions asked, the testimony given, and the proceedings had;

That I am neither attorney nor counsel, nor in any way connected with any attorney or counsel for any of the parties to said action, or otherwise interested in its event.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 30th day of November, 2005. My commission expires April 22, 2009.

Carmen Murphy
Registered Professional Reporter
and Notary Public.