# DEFENDANT TRANS UNION LLC'S CONCISE STATEMENT OF MATERIAL FACTS AND EVIDENCE

# EXHIBIT "J"

NORMAN K.K. LAU
Attorney at Law
A Law Corporation

NORMAN K. K. LAU          1795
820 Mililani Street, Suite 701
Honolulu, Hawaii 96813
Telephone No. (808) 523-6767
Facsimile No. (808) 523-6769
Email: norm@normlau.com

ROBERT S. SOLA, P.C.
Attorney at Law

ROBERT S. SOLA (*pro hac vice, OSB No. 84454*)
8835 SW Canyon Lane, Suite 130
Portland, OR 97225
Telephone No. (503) 295-6880
Facsimile No. (503) 291-9172
Email: rssola@msn.com

Attorneys for Plaintiff
GERALD H. ELLER

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GERALD H. ELLER,<br><br>        Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC., a foreign corporation; TRANS UNION LLC, a foreign corporation; and BANK ONE CORPORATION, a foreign corporation,<br><br>        Defendants. | CASE NO. CV 04-00174 DAE-KSC<br><br>PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT |

<u>PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT</u>

Pursuant to Fed. R. Civ. P. 26(a)(2) plaintiff Gerald H. Eller discloses that Evan

Hendricks may be used at trial as an expert witness.  Mr. Hendricks' written report is attached

hereto.

DATED: Portland, Oregon, _November 16, 2000_ .

_____
ROBERT S. SOLA (pro hac vice)

Attorneys for Plaintiff
GERALD H. ELLER

And,
NORMAN K. K. LAU
Attorney at Law

## PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT

I, Evan Hendricks, provide the following preliminary Expert Report pursuant to Federal Rules of Civil Procedure 26(a)(2) in connection with the action entitled. <u>Gerald H. Eller v. Experian Information Solutions, et al.</u>: U.S. District Court for the District of Hawaii, Case No: 04-CV-174 DAE KSC. I will supplement this report if additional facts and evidence are produced in discovery and deposition of Defendant's corporate witness.

**1.    Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (Privacy Times 2004), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation;

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (Privacy Times 2004). The book has 22 Chapters, 359 pages and 369 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of <u>Your Right To Privacy: A Basic Guide</u>

1

To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified before Congress on numerous occasions – always by invitation. On July 21, 2005, I testified before the House Financial Services Subcommittee on Oversight in its hearing, "Credit Card Data Processing: How Secure Is It?" The hearing focused on recent breaches of data security, and their impact on data security, privacy and accuracy. On March 15, 2005, I testified at the Senate Banking Committee's hearing, "Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information."[1]

In 2003, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security. The following are the titles and dates of only the 2003 hearings in which I testified, or in the case of the FTC, presented:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

---

[1] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144

2

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

I regularly present at Continuing Legal Education or professional seminars related to the FCRA, including Glasser LegalWorks (Sept. 2004), Privacy and American Business (Feb. 2004), and the National Credit Reporting Assoc. (Nov. 2004). In 2005, I presented at separate FCRA-related seminars sponsored by the Practicing Law Institute and Texas Bar Association, and was invited back to present at Glasser LegalWorks May 2005 FCRA seminar.

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. The Council meets twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

## 2.    Testimony And Expert Reports

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird qualified me to testify about CRA procedures and their impact on the

consumer, and the nature of identity theft. The U.S. Court of Appeals for the Ninth Circuit ruled that Judge Baird overly limited the scope of my testimony, specifically finding that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Matthew Kirkpatrick. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 02-1197-MO. FCRA, identity theft. Expert report. Deposition. Trial Testimony

Joi Helmes v. Wachovia Bank N.A.: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report. Trial Testimony

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition. On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me. The case settled shortly thereafter.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection).

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA. Expert report, deposition.

4

Larry Alabran v. Capital One Services, Inc.,: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE. Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports. Deposition

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C. Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div. FCRA. Expert report. Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438. FCRA. Expert report. Deposition

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433. FCRA. Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for the District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

Bruce Danielson v. Experian Information Solutions: U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. Expert report, deposition.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value.

<u>Fee</u>

My fee is $250 per hour for preparation and for consulting; $250 per hour, or a minimum of $1,000 per day, for deposition or trial testimony, plus reasonable travel time, plus travel costs and expenses.

## <u>Opinions & Basis</u>

At this point in time, to a reasonable degree of professional certainty, I hold the following preliminary opinions in the case of <u>Gerald H. Eller v. Experian Information Solutions, et al.</u>:

The keys to understanding precisely what went wrong – and why – in a case like this are the defendants' internal documents, followed by a competent deposition of appropriate corporate witnesses. Since I have not yet had access to some of these important sources, I am unable at this time to provide a detailed analysis. Still, the limited information available in this case, coupled with what is known about the practices of certain CRAs and creditors, enables me to express preliminary opinions.

## <u>Nature & Purpose Of Credit Reports & Scores</u>

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems. If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, and other related matters.

While there is growing public awareness about the credit reporting system, public awareness is by no means universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports. Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

Therefore, it is important that the trier of fact have an accurate understanding of the nature and purpose of credit reporting and credit scoring. Accordingly, a brief description of the consumer report is fundamental to my opinion in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information,

such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)    A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

(2)    A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3)    If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.

(4)    A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

## Nature & Purpose of Credit Scores

A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union,[2] are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with the higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

---

[2] Until recently, the Trans Union FICO score was called "Empirica"

For example, on a $150,000 30-year, fixed-rate mortgage, a consumer with a 720 score might pay a 5.6% interest rate with a monthly payment of $861, while a consumer with a 619 score would pay an 8.53% rate with a monthly payment of $1,157. The difference in payment is $296 per month, or $3,552 per year. For major credit transactions like mortgages or refinancing, too low of a FICO score can disqualify consumers for most, if not all, loan packages. Similarly, the existence of certain types of derogatory information in the credit report, including unpaid bills or collections, can make the consumer ineligible for major credit.

Like credit reporting, there is low public awareness about credit scoring. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

> Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates.
> http://www.consumerfed.org/092104creditscores.PDF

## Historical Background: CRAs, Mixed Files & Reinsertion

There is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[3] This history is covered in Chapter 10 of my

---

[3] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me? The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org,* July 2000.

book, "Credit Scores and Credit Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy, and "mixed files," and CRA non-responsiveness, and inadequate reinvestigations became the cause of complaints to the FTC. These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions. These actions resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data , being more responsive and conducting adequate reinvestigations. Thus, for well over 10 years, CRAs have been aware of problems regarding some of their routine practices and the damages that these practices cause consumers.

In fact, the first two settlements were simultaneously reached December 10, 1991, between TRW, Experian's predecessor, and the FTC,[4] and 18 State AGs.[5] This was an industry-wide phenomenon, as Equifax came to a similar settlement with the State AGs in June 1992, and with the FTC in 1994. In October 1992, Trans Union reached a similar settlement with 18 States.

The first issue addressed in TRW consent agreements was the problem of inaccuracy caused by "Mixed Files." The agreements defined "Mixed File" as "a Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the consumer report." The Agreement also emphasized the importance of using "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

The first substantive section of the agreement stated:

II.    In connection with the furnishing of Consumer Reports, TRW shall be, and hereby is, enjoined from failing to comply with the FCRA. TRW shall be enjoined from failing to:

1.    Implement, utilize and maintain reasonable procedures to prevent the occurrence or reoccurrence of Mixed Files, including but not limited to accepting and using a Consumer's Full Identifying Information, for matching and identifying purposes.:

a. Continuing its efforts to improve its information gathering, storing and generating systems to reduce the occurrence of Mixed Files, through modification

---

Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

[4] FTC v. TRW Inc., USDC-N.D. Texas – C.A. No. 3-91CV2661-H; Dec. 10, 1991
[5] TRW v. Dan Morales, et al., USDC-N.D. Texas – C.A. No. 3-91-1340-H; Dec. 10, 1991

of its software system to enable such system to accommodate and use, for matching and identifying purposes, a Consumer's Full Identifying Information; and

b. Not later than July 31, 1992, implementing and utilizing changes to its system designed to prevent, to the extent it reasonably can, the reoccurrence of Mixed Files, once known...

The 1992 FTC and State AG Consent Orders also emphasized the need to conduct adequate reinvestigations, and provided several specific standards, including:

iii.    ... Accepting the Consumer's version of the disputed information and correcting or deleting the disputed information, when the Consumer submits to Equifax documentation obtained from the source of the information in dispute which confirms that the disputed information on the Consumer Report was inaccurate or incomplete ...

iv.    Employing reasonable procedures designed specifically to reinvestigate disputes from Consumers that result in Mixed Files.

It is worth noting that in a subsequent consent order with Equifax, the FTC was even more specific, directing Equifax:

v.    As to Consumer disputes concerning Mixed Files, assigning such disputes, for investigation and resolution, to Senior Investigators who are experienced in handling such disputes. In such cases the Investigator shall, as appropriate: 1) pull all files which may be involved in the dispute; 2) fully verify disputed tradelines to determine whether the tradeline is owned by the Consumer in whose file it resides; 3) make any changes, deletions, or additions to correct the Consumer's file and resolve the dispute; and 4) for files which are found to be mixed, prepare a summary and hard copies of the files involved to the systems support division of the Data Processing Department, for review and analysis by that Department as to the need for corrective action...

Moreover, both the FTC and AG consent orders with TRW squarely addressed the issue of reappearance:

4. Maintain reasonable procedures so that items disputed by a Consumer, which are deleted or corrected as inaccurate or unverifiable upon reinvestigation, do not subsequently appear on Consumer Reports pertaining to that Consumer ...

This Consent Agreements are relevant because (1) they created widespread publicity about the problems of credit report inaccuracy and (2) they formed the foundation for the 1996 Amendments to the FCRA. However, Congress knew that to ensure accuracy, it needed to go beyond the Consent Agreements by placing additional duties on credit reporting agencies as well as duties on furnishers to report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary: "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. *Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors.*" [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA. Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher. Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform him or her of his right to add a statement.

Despite all of these efforts, these problems did not go away. Two separate studies -- by U.S. PIRG in March 1998 and by Consumers Union in 2000 found significant rates of inaccuracy and mixed files in consumer reports. More comprehensive studies in December 2002 by the Consumer Federation of America and the National Credit Reporting Association, and in February 2003 by the Federal Reserve Board, also found significant rates of inaccuracy and mixed files in consumer reports.

## Identity Theft: Long-Standing & Prevalent

Yet another problem with potential serious consequences to consumers and their credit reports is identity theft. Identity theft occurs when an imposter steals a consumer's identity, usually a Social Security number and sometimes a name and address, for the purpose of exploiting the good name and/or credit-worthiness of an innocent consumer, obtains credit in the name of the innocent consumer, and absconds with goods. This activity leaves the innocent consumer with a credit report polluted by imposter-generated unpaid debts and a plunging credit score. Many times, consumers first learn they are victims of identity theft when they receive collection phone calls relating to debts that they were incurred by the imposter.

Identity theft is a sub-category of the more general category of Mixed Files, as the typical result of identity theft is that the imposter-generated fraudulent activity is mixed into the consumer report of the innocent victim. Clearly, identity theft can have even more profound implications, as the improper mixing of the imposter-generated debts into the innocent victim's consumer report associates that victim with fraudulent activity. In fact, identity thieves have benefited from the CRAs' tendency to mix files. For example, if on a credit application the identity thief misspells the victim's name, or makes other mistakes, or puts a completely different

address than that of the victim, the CRA nonetheless will often "return" to the credit grantor the victim's credit history or credit score, thereby allowing the imposter to obtain credit.

For the innocent victim, however, identity theft is a nightmare. Victims face the same or even greater difficulty in getting the CRA to perform an adequate reinvestigation, to correct inaccuracies and delete the improperly mixed data, and to prevent the reinsertion of previously deleted information.

Identity theft first started showing signs of becoming a serious problem in 1992, around the same time that credit report inaccuracies were a leading cause of consumer complaints and the FTC, State AGs were working to establish a higher and more specific standard of care.

According to Trans Union's statistics, as reported by the U.S. General Accounting Office, Trans Union received 35,235 consumer inquiries about identity theft in 1992. By 1997, the number of inquiries grew to 522,922. More recent GAO reports indicate that identity theft continues to escalate in the United States. Considering the potentially negative impact on consumers, the existence of identity theft heightens the need for furnishers to adhere to a high standard of care in the collection of consumer information and its reporting to CRAs.

On March 7, 2000, Jodie Bernstein, then head of the FTC's Bureau of Consumer Protection, testified before Senate Judiciary Subcommittee on Technology, Terrorism and Government.    In Ms. Bernstein's July 12, 2000 testimony regarding typical identity theft cases, she pointed out to the subcommittee the exact types of problems which Mr. Kirkpatrick faced in dealing with Equifax. Ms. Bernstein testified:

> The leading complaints by identity theft victims against the consumer reporting agencies are that they provide inadequate assistance over the phone, or that they will not reinvestigate or correct an inaccurate entry in the consumer's credit report. In one fairly typical case, a consumer reported that two years after initially notifying the consumer reporting agencies of the identity theft, following up with them numerous times by phone, and sending several copies of documents that they requested, the suspect's address and other inaccurate information continues to appear on her credit report. In another case, although the consumer has sent documents requested by the consumer reporting agency three separate times, the consumer reporting agency involved still claims that it has not received the information.

## Experian Caused The Problem & Compounded It By Refusing To Correct It

In my preliminary opinion, Experian caused inaccuracies in Mr. Eller's credit report by improperly mixing negative data about "Jerry (or Gerald) Willard" into plaintiff's credit report. Then, Experian compounded the problem by failing to correct the information after receiving Mr. Eller's disputes, or prevent its reappearance after it was removed.

## 'Partial Matching' of SSNs & Other Data Cause Inaccuracy

Experian uses a system of partial matching of identifying information which facilitates the improper mixing of credit report data. For example, Experian's system accepts partial matches of SSNs and other identifiers, meaning that if there is only a minor discrepancy between two individuals' SSNs, and there are enough commonalities in the spelling of their names (or other possible identifiers listed in the following paragraph), then Experian's system will consider these two individuals one and the same and merge their information into one credit report when a subscriber asks for a report on one of the individuals. Remember, the FTC and State AGs identified "mixed files" as the leading cause of inaccuracy in the early 1990s. They attempted to remedy the situation by encouraging Experian and the other two CRAs to use "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number." However, this case indicates that Experian disregarded these goals and continued to rely on partial matching in a manner that was detrimental to plaintiff.

## Reinvestigation Failures

Of particular relevance to this case is the failure on the part of Defendant Experian to conduct adequate reinvestigations after receiving Mr. Eller's disputes. The history of CRAs' and furnishers' inadequate reinvestigations, and the response to that history by Congress, federal and state enforcement officials, consumer groups and the media, effectively put the financial services industry on notice several years ago that their routine method of reinvestigation would not facilitate correction of inaccuracies.

The "reinvestigation" procedure followed by Experian and furnishers essentially consists of an exchange of messages known as "Consumer Dispute Verifications" (CDVs). When the consumer sends his dispute to Experian, Experian populates the CDV form with his identifying information (name, address, city-state-zip, SSN, sometimes previous address), and a two-or three-digit, or alpha-numeric code that cryptically describes the dispute (e.g., "not mine"), and instructs the furnisher to provide "complete ID."

Upon receipt of the CDV form, the furnisher complies with the credit reporting agencies' request and indicates the identification information of the accountholder and whether it matches the identification of the person disputing.

Thus, this process is better described as a *comparison* of each entity's existing data on the consumer, rather than an independent evaluation or investigation of whether the person disputing is actually the accountholder, or records have been mixed, there has been fraud, etc.

As this case illustrates, there are several problems with the CDV-exchange serving as the principal means of responding to consumer disputes. First, a cursory exchange of messages does not amount to an investigation under any normal sense of the word. The Webster's New Collegiate Dictionary defines "investigate" as, "v. To observe or study by close examination and systematic inquiry. Systematic—adj. Marked by thoroughness and regularity." An exchange of messages is neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

Second, in cases involving mixed files or identity theft, in which improper merging or use of identifiers *is the cause* of the inaccuracy, the CDV-exchange is not reasonably calculated to successfully determine whether a consumer's dispute should be honored. For example, if similar names or SSNs are causing CRA algorithms to mis-merge data onto a consumer's report, then a superficial comparison of identifiers is not going to uncover the problem. Or, in a fraud situation, where the imposter has used the exact SSN of the innocent victim, a comparison of CRA- and furnisher-held SSNs accomplishes nothing. Accordingly, I am aware of several cases in which CRAs and furnishers told consumers they had "verified" information that was in fact false.

Third, the CDV is prone to defects. For instance, in this case, the evidence indicates that some of the ACDVs that Experian sent to creditors regarding Mr. Eller contained inaccuracies.

Fourth, the CDV often does not include, or cannot include, relevant information provided by the consumer. The failure to convey this relevant information to the furnisher impedes or prevents the furnisher from conducting a reasonable investigation.

Fifth, because Experian relied principally on the CDV-Exchange, it did not take other reasonable investigative steps that would be more effective. For example, plaintiff or his attorney provided contact information enabling Experian to contact either one of them. But Experian never used the contact information to resolve the problem effectively.

Sixth, Experian did not carefully consider important information and clues in Mr. Eller's disputes. This indicated there was an absence of reflection and analysis on the part of Experian's investigators, in my opinion.

Seventh, Experian did not carefully consider the information it maintained that was relevant to Mr. Eller's disputes. In my preliminary opinion, Experian maintained information that would have helped it realize that Mr. Eller's disputes were genuine, but failed to consider it.

Eighth, under Experian system, inaccuracies in Mr. Eller's Experian credit report would have persisted indefinitely. As was the case with other victims of chronic inaccuracy caused by mixed files or identity theft, it was only by filing a federal lawsuit that he was able to effectuate substantial correction of his credit report. Yet, even after the lawsuit, previously deleted false information reappeared.

## CRA's Response To The Reinsertion Problem

As the above-described history indicates, "reinsertion" has consistently been a problem. A fundamental reason for this is that when inaccurate information is disputed, and subsequently deleted by the CRA, the credit grantor continues to furnish the inaccurate data in the course of its routine monthly reporting. In other words, it is not uncommon for the furnisher to fail to delete the inaccurate information from its system that routinely reports it to the CRAs.

14

The CRAs recognized that this was a problem. Thus, they developed a mechanism for preventing previously deleted data from being wrongly reinserted into credit reports. It is my understanding that Experian refers to this mechanism as a "soft delete;" Equifax refers to it as "suppression;" and Trans Union refers to it as "cloaking." Trans Union's "cloaking" mechanism was discussed in <u>Cousin v. Trans Union</u> 246 F.3d 359, 5th Circ. 2001). The Fifth Circuit concluded that one aspect of Trans Union's cloaking procedure – its decision to cloak accounts for only one year – was "not reasonable as a matter of law and the issue of reasonableness was properly before the jury to consider."

Thus, it is imperative in this case that we have a complete and thorough description of Experian's "cloaking" or "soft delete" function. Typically, CRAs use a very stringent matching function for suppressing previously deleted information from re-reporting to its system. That is, CRAs have previously testified that they essentially require an exact match of several data fields in order for the CRA's system to prevent it from re-reporting to the consumer's credit report. Some of the fields typically include the account number of the consumer's "tradeline," and the furnisher's subscriber number. However, past testimony also indicated that some furnishers have more than one subscriber number. Thus, if the furnisher is reporting under a different subscriber number than that which was noted in the original suppression function, that could permit the previously deleted tradeline to re-report to the CRA's system. The same would apply to other changes in the subscriber number or the account number, caused by company mergers, assignments to collection agencies, sales of accounts, or simple transposition, human or system error.

The stringent matching function for suppression is contrasted by the much looser, "partial matching" CRAs typically use when determining what information to include on a consumer's report. Viewed together, the two contrasting approaches underscore the CRAs goal of including all "maximum possible information" on a consumer's report, in my opinion. Unfortunately, this goal can be at odds with the FCRA's requirement of "maximum possible accuracy," in my opinion.

## Damages From Reinsertion

The reinsertion of previously deleted data is particularly damaging, in part because the consumer has the expectation that the CRA knows the information is false and knows not to permit its reinsertion, in my preliminary opinion. Moreover, false information can contribute to other errors.

## Experian's Mechanism(s) For Preventing Reappearance

The reappearance of previously deleted data on Mr. Eller's credit report suggests to me that Experian lacked adequate mechanisms for preventing such reinsertion. I look forward to learning what precise defect or defects in Experian's mechanism permitted this to happen.

Moreover, there has been no indication thus far that Experian attempted to certify the information was accurate, or notify Mr. Eller of his right to place a statement on his credit report.

15

Further discovery could demonstrate that Experian lacks adequate mechanisms for carrying out these functions as well, in my preliminary opinion.

---

## An Approach For Identifying and Measuring Damages

To improve understanding of the damages typically suffered by victims such as plaintiffs, in 2003 I unveiled an approach for identifying and measuring them. I have presented this approach in a June 2003 National Workshop sponsored by the FTC, and in my July 2003 testimony before the Senate Banking Committee on credit report accuracy. I also have published this approach in my book.

In a 2003 FCRA case,[6] plaintiff's counsel calculated that Plaintiff worried about or was tormented for 15 hours per week, or slightly less than 2.5 hours per day, about inaccuracies in her consumer report. While this is a start, in my opinion, a more robust formula is needed to fairly gauge damages.

The following approach first requires one to identify the applicable categories of damage in the given case, and then determine which of the factors listed below are relevant.[7] In essence, the approach could operate like a credit scoring model, "assigning weights or points" to each category, and then deter-mine whether Factors (1) through (5) increase the gravity of the damage. Whether or not the approach is adopted as a formula and is applied in this manner, what is most important is that it helps identify the typical categories of damage and helps a jury determine if these damages compounded over time.

My review indicates that Mr. Eller experienced the kinds of damages that are described in some of the following categories.

### Some Categories of Typical Damages/Costs of ID Theft & Inaccuracy

(1) Inaccurately described as not creditworthy to third parties
(2) Improperly denied credit because of inaccurate data
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

---

[6] Boris v. ChoicePoint: USDC-W.D. Kentucky (Louisville) – No. 3:01CV-342-H; March 14, 2003
[7] Prepared Statement of Evan Hendricks, "The Accuracy of Credit Report Information and the Fair Credit Reporting Act," Senate Banking Committee; July 10, 2003 http://banking.senate.gov/03_07hrg/071003/index.htm; and, Presentation of Evan Hendricks, "Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information." Federal Trade Commission National Workshop; June 18, 2003. http://www.ftc.gov/bcp/workshops/infoflows/030618agenda.html

The following factors could be used to gauge the severity of damage within each category.

**FACTORS**

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

## Mr. Eller's Damages Were Consistent with Other Victims of Credit Report Inaccuracy

The evidence thus far indicates that Mr. Eller's damages were consistent with other victims of credit report inaccuracy, in my preliminary opinion. He was inaccurately described as less creditworthy than he actually was to third parties. He had to expend time and energy to correct errors not of one's making. That also entailed a loss of time and energy, loss of opportunity. The repeated errors, unexplained reinsertion and inadequate dispute investigations caused Mr. Eller to lose reasonable control over his personal information.

Mr. Eller's damages were potentially compounded by virtue of being in the military, where derogatory credit report information can cause one to the deemed substandard, or worse, a security risk. Thus, it was stressful for Mr. Ellis to have to worry that errors in his credit report could negatively impact his position in the military. It was stressful to have to explain to his superior(s) why there were errors on his credit report that could flag him for additional scrutiny by U.S. Defense Dept. investigators.

## Materials Considered

In specific preparation for this case, I have reviewed the following:

Plaintiff's Complaint
Plaintiff's credit reports
Documents produced by defendant
Defendant Supplemental responses
Plaintiff's and Defendant's correspondence
Protective Order

In addition, I relied generally on:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,
National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can Do
(2nd Edition, Privacy Times 2005)

My opinions in this case are also based on my 25-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert. My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 15th Day of November 2005, in Bethesda, Maryland**

**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

18

# *Evan D. Hendricks*

## *CURRICULUM VITAE*

**Professional Activities**

**1981- Present**     **Editor/Publisher** of *Privacy Times*

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present**     **Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present**     **Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004**     **Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002**     **Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

Evan Hendricks          P.O. Box 302          Cabin John, MD 20818
          **(301) 229 7002  (301) 229 8011 [fax] evan@privacytimes.com**

**Recent Testimony Before Congress & The FTC**

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit," November 9, 2005

"Credit Card Data Processing: How Secure Is It?"  House Financial Services Subcommittee on Oversight , July 21, 2005

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information," Senate Banking Committee, March 15, 2005

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003

Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do 2nd Edition (Privacy Times, 2005)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)
The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)
The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)
The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

## Presentations/Instruction At Recent CLE & Professional Seminars

"2005 Consumer Rights Litigation Conference," National Consumer Law Center, Oct. 27-30.
     (1) Bankruptcy Roundtable and (2) Fair Credit Reporting Act Roundtable
"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,
February 28- March 1 (New York City)
"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005
"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004
"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process,"
Glasser LegalWorks, Sept. 28-29. 2004
  "The New FACT Act: Challenge & Opportunity," Privacy & American Business, Feb. 9-10,
2004

## Professional Societies

Past President and Board Member, American Society of Access Professionals
www.accesspro.org

## Industry Certification

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

## Media

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996,
I am quoted regularly by major and small newspapers (including *The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek* and *Money Magazine*), regarding issues of privacy generally and the privacy implications of consumer reporting specifically.  I have appeared on ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and such shows as the Oprah Winfrey Show and Geraldo, regarding a wide range of privacy issues.

## Education

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)